**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL L.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22 C 6976** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed his application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§416(i), 423, 1381a, 1382c, over five and a half years ago in November of 2017. (Administrative Record (R.) 196-207). He claimed that he had been disabled since August 3, 2017 (R. 196) due to a herniated disc. (R. 227). Plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. He filed suit in federal district court under 42 U.S.C. § 405(g), and Magistrate Judge David Weisman remanded this case by agreed order on September 22, 2021. There was another hearing, another ALJ decision denying plaintiff's claim, (R. 757-832), and plaintiff filed another suit for review in federal district court on December 12, 2022. See 20 C.F.R. §§404.955; 404.981. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on December 16, 2022. [Dkt. ##7, 9]. Plaintiff again asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairment: degenerative disc disease of the lumbar spine. (R. 764). The ALJ said the plaintiff's other impairment – polycystic kidney disease – caused no more than minimal limitations on work activites and was, therefore, nonsevere. (R. 764). The ALJ added that, while the plaintiff made some references to references to anxiety and depression, there was no record of any mental health treatment and exams always noted normal mental status. (R. 764). As such, this was not a medically determinable impairment. (R. 764). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 1.16 and 1.16. (R.764).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the additional limitations of only occasional climbing, stooping, kneeling, crouching, and crawling. (R. 764). Next, the ALJ summarized the plaintiff's complaints regarding his herniated disc. The ALJ noted that the plaintiff complained of back pain due to a herniated disc. said testified to back pain. The plaintiff said he sees his primary care doctor, goes to physical therapy, and sees specialists. He has more bad days than good days. Hot showers help with his pain. The plaintiff said he uses a cane and wheelchair, and that some days he cannot get out of bed and cannot move, and other days he can do chores and care for himself. (R.765). The ALJ then found that while the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; . . . the

2

[plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 477).

The ALJ went on to review the medical record, noting that plaintiff injured his back at work on June 24, 2016. In July 2016, his gait was normal, lumbar flexion was 60 degrees, extension 20 degrees, right and left lateral bend was 20 degrees, and right and left rotation was 20 degrees. Straight leg raise was positive on the right at 60 degrees and negative on the left. Knee extension was 5/5, ankle plantarflexion and dorsiflexion was 3/5 on the right and 5/5 on the left. Plaintiff was taking Meloxicam, Flexeril, Terocin, and Gabapentin. The ALJ noted that, while physical therapy was recommended, there is no record of any sessions. (R. 765). Plaintiff did, however treat with a chiropractor at that time. As plaintiff continued to suffer pain, he was treated with injections, which provided relief for 2-3 weeks, and prescribed Norco. He was then referred to a neurosurgeon and underwent a hemilaminectomy on the right side at L5-S1in January 2017. (R. 766).

At a followup exam in May 2017, plaintiff reported continuing pain, but said it was greatly reduced, although it was radiating to his right foot. Strength and reflexes were unaffected and there was no atrophy. Neurotonin dosage was increased. An MRI revealed a soft tissue structure indenting the thecal sac which was presumed to be post-surgical scarring. There was no significant spinal stenosis, but there was mild bilateral neuroforaminal, again presumably from the scar formation. The ALJ noted that again, physical therapy was recommended but there was no record of plaintiff following through with that. (R. 766). In August 2017, the workers' compensation examining doctor said he could not substantiate a work injury dating back to the June 2016 date, requiring surgical intervention, and said he found no objective basis for further treatment or for

3

work limitations. He notes several inconsistencies during the exam, felt plaintiff's complaints of pain were out of proportion to the objective findings. (R.766). Plaintiff's doctor noted he had had a functional capacity evaluation and said "upon review of the report may or may not be valid". He said plaintiff might be a candidate for a transforaminal lumbar fusion at L5-S1 if he did not improve soon. (R. 766-67).

The ALJ related that plaintiff continued chiropractic treatment and began treatment with a pain specialist in November 2017. The doctor noted mild tenderness in the right SI joint and mid region facets. There was moderate tenderness in the lower region facets and extension and rotation were limited by pain. Straight leg rasing was positive on the right, and the right leg had decreased sensory response at L-4, L5 and S1. The doctor discussed use of a spinal chord stimulator and prescribed Lyrica and Norco. The ALJ noted that in December 2017, plaintiff was his medication the medication as needed, rather than consistently on a daily basis as prescribed. His doctor advised against that, particularly given that plaintiff's functionality had improved and plaintiff reported a 60% reduction in his pain score with medication. (R.767)

In March 2018, the plaintiff said that Lyrica had worked well, reducing his pain score by about 40-50%. His functionality continued to improve. His gait had normal pace and structure. But, his insurance would currently not approve Lyrica. He was also still waiting for approval of a spinal cord stimulator. The ALJ noted that that same month, plaintiff went to the emergency room after aggravating his back pain in a physical altercation with police. Plaintiff asked for 10 Norco but was noted as in no acute distress, with normal range of motion. Plaintiff became verbally abusive and physically aggressive with staff at one point and threw a urinal across the counter, spilling urine. He was discharged into police custody on ibuprofen. (R. 767). In April 2018, the plaintiff reported

4

that the Norco and ibuprofen continued to help control his pain. Again, Lyrica was denied by insurance. At the time, plaintiff's urine drug test results were positive for alcohol but negative for prescribed Hydrocodone. (R. 767).

The ALJ noted that in October 2018, plaintiff's last urine drug screen had been inconsistent as it was negative for the prescribed Norco despite Norco being prescribed. Plaintiff reported severe pain in November 2018, and exam showed his right mid region facets were mildly tender, and his right lower region facets were moderately tender. Extension was limited and produced right lumbar spine pain; rotation and extension were limited and produced ipsilateral lumbar spine pain. Straight leg rasing was positive on the right, producing calf pain. Records showed that over a period of f approximately 29 days he had taken only 35 Norco, or about one a day, contrary to his report to Dr. Glaser that he was taking four Norco per day. The doctor again advised plaintiff to take his medications as directed. (R. 768).

The ALJ went on to note that there was no record of any treatment for about a year between November 3, 2018, and September 20, 2019. At a September 2019 neurosurgery consult, exam revealed full strength throughout the lower extremities, normal reflexes aside from diminished right ankle jerk. There was hyperesthesias to light touch in S1 on the right side. In November 2019, a CT of the lumbar spine showed cortical defects of the left L5 pars interarticularis and lamina and stable, mild retrolisthesis of L5 on S1 with L5-S1 disc bulge displacing the right S1 nerve root. Spinal fusion surgery was recommended. (R. 768).

In February 2020, the claimant had an EMG of the lower extremities that was abnormal but inconclusive. There was electrodiagnostic evidence of possible right S1 radiculopathy based on low tibial motor response and prolonged right tibial H reflex. But this could not be confirmed with the

5

needle portion of the EMG study as the plaintiff was unable to tolerate it. Exam showed full (5/5) strength in the bilateral KE but 4/5 strength in the bilateral HF and DF and decreased sensation to light touch in the right L3-S1 dermatomes but normal sensation on the left. (R. 768).

The ALJ noted another year-long gap in treatment from March 2020 to March 2021. At that time, plaintiff began treatment with a new doctor. Spinal fusion surgery seemed to be back on the table as plaintiff returned to the neurosurgery clinic for the first time in a year and a half in November 2021. An updated MRI of the lumbar spine in June 2021 showed that at the L5-S1 level there was s diffuse disc bulge with a large paracentral/foraminal disc protrusion which was impinging and displacing the right S1 nerve root. (Ex. 21F/124). The ALJ noted that, in July 2021, EMG study findings most consistent with chronic right L5/S1 radiculopathy without any active denervation, with no obvious evidence to suggest a worsening when compared to the previous study in February 2020.

The ALJ went on to relate that an MRI of the lumbar spine in March 2022 showed a disc herniation at L5-S1 with mass effect upon the right S1 nerve root and was described as quite similar to the plaintiff's previous study. Plaintiff chose not to have spinal fusion surgery and did not return to the neurosurgery clinic after July 2021. The ALJ reported that in May 2022, the claimant was to start physical therapy prescribed by Dr. Joshi, his primary care provider, but the record includes reports for just two visits.

In rejecting the plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms, as inconsistent with the objective medical evidence and the course of medical treatment, the ALJ began by noting that plaintiff initially received conservative treatment after his back injury. The ALJ also noted that while physical therapy was recommended, and plaintiff

reported to his doctors he was going, there is no documentation of any physical therapy until May of 2022 where he had an initial session and then one subsequent visit nearly a month later. The ALJ acknowledged that plaintiff's course of treatment did advance to back surgery in January 2017, but added that in the minimal follow up the plaintiff had with the surgeon, he exhibited improved strength and no neurological loss in the lower extremities. The ALJ went on to note that, while plaintiff had testified that no medications helped relieve his pain, he told his physicians that Norco was effective. He said Lyrica was as well, but his insurance didn't cover it. The evidence also showed that plaintiff did not take his medications as directed, despite doctors repeatedly advising him to. (R. 770). The ALJ added that there were two lengthy gaps in plaintiff's treatment and said there was no evidence that these were due to lack of insurance. (R. 770-71). The ALJ added that the incident with the police and at the emergency room demonstrated the ability to move quickly and rather aggressively, inconsistent with allegations of debilitating back pain. (R. 771).

Finally, the ALJ said that, while exams had inconsistently shown decreased sensation in the lower extremities, gait "abnormalities," and limited range of motion of the spine, by and large, the exams showed normal or good strength, no weakness or instability in the lower extremities, and no significant neurological loss. She also noted that the only worker's compensation-related exam revealed significant inconsistencies and complaints out of proportion to objective findings, and that plaintiff's neurosurgeon noted that that evaluation conducted in July 2017 "may or may not be valid". The ALJ then added that plaintiff attended a party a few years earlier and flew to Louisiana to care for his father. (R. 771). The ALJ added that although plaintiff testified he had a home care-giver, the evidence regarding that was vague at best, with a document showing eligibility establish for the service but indicating "no provided services reported." The ALJ closed her discussion by

7

noting that while plaintiff testified he uses a cane and a wheelchair, there was not medical documentation of that. (R. 771).

The ALJ then turned to the medical opinions in the record. She found that the opinions form the state agency medical consultants that plaintiff's impairment was non-severe were not persuasive as more recent records supported the existence of a severe impairment. The ALJ then noted that the record included a number of forms completed by multiple physicians that were apparently related to plaintiff's worker's compensation claim, showing the providers advised "off duty", or stated "off work/out of work." The ALJ explained that those notes were not persuasive because they reflected temporary limitations rather than an evaluation of the effects of the plaintiff's lumbar impairment over the entire period at issue. Moreover, the notes provided no information about specific functional limitations and thus do not meaningfully inform the residual functional capacity finding. (R. 771).

The ALJ noted that the doctor who conducted the 2017 medical exam in relation to the plaintiff's workers' compensation claim, opined that there was no reason the claimant could not work from an orthopedic standpoint. But, there were a lack of specifics as to functional capacity and the ALJ found it not persuasive as it is not fully consistent with the claimant's treatment history of lumbar surgery and physical examination findings that support some functional limitations because of his spinal impairment. (R. 772).

The ALJ felt that work status notes indicating that the plaintiff could not lift more than 20 pounds, bend, kneel, jump, or climb ladders were of limited persuasive value. The ALJ explained that it appeared the stated limitations were intended to be temporary and, while they support a finding that plaintiff could do a range light work, the opinion that he cannot bend, kneel, or climb

ladders is not supported, explained, or consistent with the objective findings or course of treatment outlined above. The ALJ added that the notes were from prior to the plaintiff's 2017 surgery and that post-surgical treatment notes documenting improvements in gait and pain symptoms do not support the limitations. (R. 772). Finally, the ALJ found the opinion from another doctor that plaintiff could not operate heavy machinery while under the influence of opioid medication was not persuasive. The ALJ said mental status exams remained normal, with no evidence of drowsiness, fatigue, decreased focus, tremors, or other signs of opioid intoxication or withdrawal, and that the plaintiff denied side effects of medications to his providers. (R. 772).

The ALJ then concluded, relying on the testimony of the vocational expert, that the plaintiff was unable to perform his past work as a truck drive or a forklift operator. (R. 773). But, based on the vocational expert's testimony, there were a number of light jobs the plaintiff could still perform including office cleaner (DOT 323.687-014; light; 200,000 jobs nationally); mail clerk (DOT 209.687-026; light; 12,000 jobs nationally); a marker (DOT 209.587-034; light; 129,000 jobs nationally); and bench assembler (DOT 706.684-022; sedentary; 30,000 jobs nationally). Even if the plaintiff were limited to sedentary work, there were jobs he could perform such as document preparer (DOT 249.587-018; sedentary; 19,000 jobs nationally); an addresser (DOT 209.587-010; sedentary; 2,700 jobs nationally); and a table worker (DOT 739.687-182; sedentary; 1,000 jobs nationally). (R. 773-74). As the vocational expert testified, even if the plaintiff required an opportunity to change positions between standing and sitting for up to 5 minutes every hour, he could still do the mail clerk, marker and bench assembler jobs and all 3 of the sedentary jobs cited. The vocational expert's testimony further indicated that even if the plaintiff were limited to sedentary work with occasional postural activities and needed an opportunity to change positions

9

for up to 5 minutes every hour, he could still perform the sedentary jobs cited. (R. 774). Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 774).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Bakke*, 62 F.4th at 1066. To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Security.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either

way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to allow the court to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep

water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash.[2] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3] As it happens, this case presents a few

---

[2] A perfect example is the aforementioned *Jarnutowski.* There, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning, 748 F.4th at 774-77, while a third judge, dissenting, thought she did. 748 F.4th at 77-79. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[3] Prior to Sarchet's "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintiff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent

(continued...)

logical bridge problems and must be remanded.

## III.

The plaintiff raises two issues with the ALJ's opinion. First, he argues that the ALJ created an evidentiary gap by rejecting all of the medical opinions in the record. Second, the plaintiff contends that the ALJ erred in evaluating his allegations regarding his pain. Because there are some gaps in the ALJ's path between the evidence and her conclusion that plaintiff's statements as to his pain were not credible, we bypass discussion of the plaintiff's first argument and focus on the ALJ's assessment of the plaintiff's complaints of pain.

### A.

In the main, the ALJ rejected the plaintiff's allegations of pain as "inconsistent with the objective medical evidence and the course of medical treatment." (R. 769). Those are both valid considerations. In assessing a plaintiff's allegations of pain and limitations, an ALJ should consider elements such as objective medical evidence of the plaintiff's impairments and treatment history, including medication. *Deborah M. v. Saul*, 994 F.3d 785, 789–90 (7th Cir. 2021); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). At the same time, an ALJ may not discredit pain complaints solely because they lack objective corroboration. *Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). And, importantly, the ALJ has to build a "logical bridge" from the evidence – here, objective findings and treatment – to her

---

[3](...continued)
> opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

conclusion that the plaintiff's allegations weren't credible. *Cullinan v. Berryhill*, 878 F.3d 598, 604 (7th Cir. 2017); *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). That "logical bridge" is a bit too shaky in this instance.

First, we'll look at those objective findings and that course of treatment to which the ALJ referred. The plaintiff suffered a herniated disc in his lumbar spine back in June of 2017 and, as the ALJ said, did treat conservatively for a few months. But that was to no avail, and plaintiff had to undergo a hemilaminectomy on the right side at L5-S1 in January 2017. (R. 766). Obviously, a herniated disc can certainly cause a great deal of pain, and surgery is not conservative treatment. There's nothing to undermine plaintiff's allegations there. Moreover, the ALJ seemed to overlook the fact that surgery was necessary and instead focused on the fact that, prior to surgery the plaintiff sought chiropractic treatment, saying that the "frequency [of that treatment suggests] he was receiving benefit in terms of pain relief and increased mobility from this treatment." (R. 769). But the end result was still surgery shortly thereafter, which suggests strongly, that things were pretty bad for the plaintiff. Thus, the ALJ's rationale doesn't make sense. Undergoing painful and risky procedures in attempts to alleviate pain tends to support claims of severe pain. *Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018).

Moving on, it's safe to say that, over the next few months, plaintiff's treating doctors arrived at the conclusion that the surgery failed. (R. 1225). The objective tests the ALJ mentioned certainly bore that out. (R. 1225). An MRI in October 2017 revealed persistent disc bulge and vertical foraminal stenosis right L5-S1. (R. 654-55). An MRI in September 2019 showed L5-S1 disk herniation on the right side, but also what was potentially an L5 bilateral pars fracture. (R. 1228-29). A November 11, 2019 CT showed disc bulge at L5-S1 displacing the descending right S1

14

nerve root, along with mild sclerosis and degenerative changes of the facet joints. (R. 1266-67). Another CT scan in March, 2020 revealed L5-S1 disc bulge displacing the right SI nerve root, cortical defects of the left L5 pars interarticularis and lamina, and stable mild retrolisthesis of L5 on SI. (R. 1234). In April 2021, – MRI shows L5 disc herniation on the right side but also potential L5 bilateral pars fracture. (R. 1330). In July 2021, EMG findings were said to be most consistent with chronic right L5/SI radiculopathy without any active denervation. (R. 1301). The ALJ did not ignore these objective test results; but, certainly, none of those objective test results undermine the plaintiff's allegations of pain. Thus while the ALJ concluded that the plaintiff's allegations are inconsistent with the objective evidence, that conclusion makes no sense, especially without much more of an explanation from the ALJ.

Then there are clinical examinations. The ALJ said these revealed no neurological loss and improved strength. (R. 770). Perhaps, but in the main they documented limited range of motion, radiculopathy, and tenderness along the lumbar spine:

> October 31, 2017 – significantly limited range of motion, 30 degrees flexion. Straight leg raise was positive on the right, and heel and toe walking were abnormal on the right. Motor strength weakened on the right. MRI revealed persistent disc bulge and vertical foraminal stenosis right L5-S1. (R. 654-55).

> November 17, 2017– mild tenderness to palpation in the right-side mid-region facet joints and moderate tenderness in the right-side lower mid-region facet joints. Lumbar extension was limited and produced pain; extension and rotation were limited and produced ipsolateral pain. (R. 687).

> January 19, 2018 – mild tenderness to palpation in the right-side mid-region facet joints and moderate tenderness in the right-side lower mid-region facet joints. Straight leg rasing positive on the right. Right leg exhibited allodynia, hyperalgesia, hyperpathis, and moderate sensitivity to light touch. (R. 676-77).

> June 5, 2018 – mild tenderness to palpation in the right-side mid-region facet joints and moderate tenderness in the right-side lower mid-region facet joints. Straight leg rasing positive on the right. Extension is limited and produces right lumbar spine

pain. Rotation+extension is limited and produces ipsilateral lumbar spine pain. Right leg exhibited allodynia, hyperalgesia, hyperpathis and moderate sensitivity to light touch. Spinal chord stimulator ordered. (R. 654-55, 1125).

August 3, 2018 – Right mid region facets are mildly tender. Right lower region facets are moderately tender, extension is limited and produces right lumbar spine pain. Rotation+extension is limited and produces ipsilateral lumbar spine pain. Right straight leg raising elicits calf pain. (R. 1118-19).

September 7, 2018 – right mid-region facets mildly tender, right lower region facets mildly tender, left mid-region facets moderately tender, left lower region facets moderately tender. Lumbar extension was limited and produced pain; extension and rotation were limited and produced ipsilateral pain, straight leg raise produced buttocks pain left and right. (R. 1114-15).

November 1, 2018 – mild tenderness to palpation in the right-side mid-region facet joints and moderate tenderness in the right-side lower mid-region facet joints. Straight leg rasing positive on the right. (R. 754-55, 1108-09).

November 1, 2018 – pain worse and more often. Screen consistent with prescriptions. There was mild tenderness to palpation in the right-side mid-region facet joints and moderate tenderness in the right-side lower mid-region facet joints. Lumbar extension was limited and produced pain; extension and rotation were limited and produced ipsilateral pain. (R. 640-41).

All of this tends to support complaints of pain radiating from the lower back down the right leg, not detract from it. *Ribaudo*, 458 F.3d at 585 (straight leg rasing tests supporting plaintiff's allegations) So, without more of an explanation from the ALJ – more of a logical bridge – it's difficult to following the path of her reasoning. *Jarnutowski*, 48 F.4th at 776;

It is also difficult to follow the ALJ's reasoning regarding plaintiff's course of treatment. Again, surgery suggests that the plaintiff had a serious problem capable of producing the type of pain he alleged. *Lambert*, 896 F.3d at 778; *see also Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016). The fact that that surgery was deemed a failure, and plaintiff was left with the option of spinal fusion, certainly doesn't make it appear that the situation, pain-wise, changed for the better.

In fact, plaintiff was prescribed narcotic pain medication,[4] injections, and a spinal cord stimulator. Again, that sounds like plaintiff's doctors, at least, did not questioning his pain allegations. *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).[5]

Then there is the problem of the plaintiff's insurance, or lack thereof, that keeps popping up in the record. Again, it's a bit difficult to follow the ALJ's reasoning regarding this point. Overall, she seems to take the position that insurance wasn't an issue in terms of plaintiff's treatment. (R. 769-70). Yet, she points out that Lyrica was effective, seemingly suggesting that plaintiff's pain

---

[4]The ALJ definitely did not seem to think along the same lines as the Seventh Circuit regarding narcotic pain medication or, indeed, along the lines of medical science. At one point in her decision, the ALJ rejected one of the plaintiff's treating physicians' admonitions that plaintiff not operate heavy machinery while taking opioid medication (R. 772), which is a common and commonsensical warning about such medication and appears throughout the medical record. (R. 695, 698, 703, 707, 1129).

[5] It's worth pointing out here that, throughout the record, none of the plaintiff's treating physicians said he could return to work or even to limited duty work. In fact, they said he couldn't do either in notes dated from July 12, 2017 to October 5, 2017 (R. 871-885), and on October 13, 2017 (R. 684), November 17, 2017 (R. 691), December 22, 2017 (R. 696), January 19, 2018 (R. 678), February 16, 2018 (R. 700), and March 13, 2018 (R. 704), and from August 13, 2018 to November 1, 2018 (R. 886-890). Only one doctor who examined plaintiff thought he could work – the doctor who examined him for his workers' compensation claim. He is also the only doctor who seemed to think that the plaintiff was faking it, saying that there was no evidence he even needed treatment or medication. (R. 666-67). That, of course, seems fantastic given the medical record. While the ALJ said she didn't find the opinion persuasive (R. 772), she did appear convinced by the doctor's assessment that the plaintiff was exaggerating or faking it and even suggested that plaintiff's own surgeon, after seeing the report, was in some agreement, quoting a snippet from the surgeons report. (R.771).

But a more thorough reading of the surgeon's report undermines the ALJ's interpretation, as the plaintiff's surgeon clearly took issue with the workers' compensation doctor's assessment:

There are several inconsistencies as I reviewed the report . . . the fact that the origin of disc herniation was relatively large, which lasts over in the second report. This was large disc herniation capable to [sic] producing intrinsic change within the S1 nerve root, which was compressed as seen before removal at surgery. At this time, this gentleman has both mechanical and radicular low back pain affecting the low back and primarily the right leg. If he does not improve soon, I would regard him as candidate for transforaminal lumbar interbody fusion at L5-S1." (R. 1662).

17

would be under control for work, but, at the same time, acknowledges that plaintiff's insurance at that time wouldn't approve Lyrica. (R. 766-67). The record shows that, similarly, plaintiff's insurance would not allow for a spinal cord stimulator. Nevertheless, the ALJ questions why the plaintiff did not follow through with that treatment option and asks why he was not able to get it through Medicaid. (R. 770). That was a question the ALJ ought to have explored with the plaintiff. *See, e.g., Jelinek*, 662 F.3d at 814; *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Finally, in saying that there was no indication that any lack of treatment or gaps in treatment could not have been due to insurance issues (R. 770-71), the ALJ seemed to ignore the fact that plaintiff was listed as self-paying on a number of medical records in 2017 and 2018. (R. R. 640-659, 679, 1108-1143).

**B.**

So, this case has to be remanded in order for the ALJ to put together more of a "logical bridge" from the evidence to her conclusions. As such, there is an opportunity to point out something that continues to perplex courts reviewing these ALJ decisions and that is the jobs that, according to the vocational expert, the plaintiff supposedly can do. At least a couple of them are suspect; in fact, one might call them "the usual suspects." "Marker", for example, seems a rather popular job among vocational experts. Its Dictionary of Occupational Titles entry dates back 46 years to 1977. That's nearly half a century ago, so one might be forgiven if they wonder whether there are still a significant number of jobs – 129,000! – where people "[m]ark[] and attach[] price tickets to articles of merchandise to record price and identifying information; [m]ark[] selling price by hand on boxes containing merchandise, or on price tickets." D.O.T. #209.587-034. But, vocational experts continue to offer it as an example of jobs plaintiffs can do and, to be fair, the vocational expert did explain that he came up with those numbers using not only Bureau of Labor

18

statistics but also Job Browser Pro. (R. 831).

Now, vocational experts aren't expected to provide a "precise count of the number of positions that exist." *Hohman v. Kijakazi*, 72 F.4th 248, 253 (7th Cir. 2023). But, trotting out the same few jobs – those "usual suspects" – over and over can be a little risky because the Magistrate Judges in this district handle an unending line of Social Security disability cases. That means they tend to see those same few jobs over and over, case after case, and, after a while . . . . Well, for example, just a few months ago, I reviewed a record where the vocational expert also employed "marker" as a job example. Unlike the vocational expert here, *that* vocational expert claimed there were only 53,000 such jobs in the national economy. *Jason B. v. Kijakazi*, No. 22 C 1850, 2023 WL 1992188, at *3 (N.D. Ill. Feb. 14, 2023); [No. 22 C 1850, Dkt. #12-1, R. 39). There is almost a year's difference in the hearing dates – the hearing in *Jason B.* was in April 2021 and the one here was in June 2022 – but would there really have been an increase of over 75,000 marking jobs over that time period? At another April 2021 hearing another vocational expert claimed there were 150,000 marker jobs. *Robert V. v. Kijakazi*, No. 22 C 1601, 2022 WL 17082528, at *2 (N.D. Ill. Nov. 18, 2022); [No. 22 C 1601, Dkt.#11-1, R. 114). So far this year, the Magistrate Judges in this district have seen job numbers for "marker" ranging from 40,000 to 305,150. *See Brian C. v. Kijakazi*, No. 22 C 1447, 2023 WL 4564564, at *2 (N.D. Ill. July 17, 2023)(129,000 jobs; Jan. 28, 2021 hearing; R. 86); *Natalie T. v. Kijakazi*, No. 21 C 1908, 2023 WL 4549748, at *2 (N.D. Ill. July 14, 2023)(40,000 jobs; Oct. 7, 2020 hearing; R. 28); *Sheila C. v. Kijakazi*, No. 1:21-CV-04006, 2023 WL 3947837, at *4 (N.D. Ill. June 12, 2023)(305,000 jobs; Nov. 19, 2019 hearing; R. 99); *Michael Z. v. Kijakazi*, No. 20-CV-6857, 2023 WL 3885882, at *6 (N.D. Ill. June 8, 2023)(305,150 jobs; May 9, 2019 hearing; R.142); *Sharon B. v. Kijakazi*, No. 3:22-CV-50133, 2023 WL 3505267, at *2

19

(N.D. Ill. May 17, 2023)(126,000 jobs; May 17, 2021 hearing; R. 60); *Casey T. C. v. Kijakazi*, No. 20 C 5746, 2023 WL 3317387, at *1 (N.D. Ill. May 5, 2023)(200,000 jobs; Dec. 4, 2019 hearing; R. 86); *Sofia W. v. Kijakazi*, No. 3:21-CV-50461, 2023 WL 2333303, at *1 (N.D. Ill. Mar. 2, 2023)(126,000 jobs; May 5, 2021 hearing; R. 60); *Troy B. v. Kijakazi*, No. 3:21-CV-50325, 2023 WL 374300, at *1 (N.D. Ill. Jan. 24, 2023)(226,000 jobs; Feb. 9, 2021 hearing; R. 71); *Kevin W. v. Kijakazi*, No. 20-CV-6557, 2023 WL 35178, at *3 (N.D. Ill. Jan. 4, 2023)(53,000 jobs; Nov. 6, 2019 hearing; R. 58). Again, the numbers vocational experts provide don't have to be precise, but these are massive fluctuations.

"Addresser" is another half-century-old listing offered by the vocational expert in this case. And, given it's description – "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing", D.O.T. #209.587-010 – it's not surprising courts have been doubting its continued existence for years. *Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015)("It's hard to believe that, as the vocational expert testified in this case, there are 200,000 people in the United States for whom this is a full-time job. And does anyone use a typewriter any more? Most addressing nowadays is either personal, as when one is sending a Christmas or get-well card, or automated, as in the case of business mailings, including mass mailings of advertisements or magazines."); *Peterson v. Berryhill*, No. 16 C 9340, 2017 WL 2274338, at *4 (N.D. Ill. May 25, 2017)("According to the vocational expert who testified in this case, in just three years, Illinois saw the number of envelope addresser positions—which seemingly would be going the way of the dinosaurs—increase by over 20%."); *see also Mary E. M. P. v. Kijakazi*, No. 3:21-CV-582, 2022 WL 4545949, at *4 (N.D. Ind. Sept. 29, 2022); *Penny P. v. Kijakazi*, No. 21-CV-1055-SPM, 2022 WL 1289355, at *5 (S.D. Ill. Apr. 29, 2022); *Yanke v. Kijakazi*, No. 20-CV-1055, 2021 WL

4441188, at *4 (E.D. Wis. Sept. 28, 2021).

Yet, "addresser" remains a favorite among vocational experts, especially so far this year, so maybe it's still a "thing." But, again, those vocational experts are all over the place when they testify as to the number of "addresser" jobs, which range from 2,700 here – which isn't glaringly unreasonable – to as many as a whopping 66,000 in recent cases, which seems fancifully robust. *Cf. Michael H. v. Kijakazi*, No. 22-CV-2446, 2023 WL 4473004, at *6 (N.D. Ill. July 11, 2023)(20,000 jobs; Nov. 22, 2021 hearing; R. 1498); *Yolanda B. v. Kijakazi*, No. 20 CV 3728, 2023 WL 3947722, at *5 (N.D. Ill. June 12, 2023)(12,600 jobs; Dec.6, 2018 hearing; R. 77); *Tasha C. v. Kijakazi*, No. 22 C 816, 2023 WL 3688167, at *2 (N.D. Ill. May 26, 2023)(32,000 jobs; Sep.9, 2021 hearing; R. 2015); *Cynthia B. v. Kijakazi*, No. 20 CV 428, 2022 WL 16781946, at *3 (N.D. Ill. Nov. 8, 2022)(21,700 jobs; Oct. 25, 2018 hearing; R. 83); *Thomas G. v. Kijakazi*, No. 20-CV-5860, 2022 WL 4234967, at *3 (N.D. Ill. Sept. 14, 2022)(13,400 jobs; Sep, 17, 2019 hearing; R. 78); *Kameka B. v. Kijakazi*, No. 21 C 860, 2022 WL 3154207, at *2 (N.D. Ill. Aug. 8, 2022)(12,000 jobs; May 26, 2020 hearing; R. 109); *Diana S. v. Kijakazi*, No. 19-CV-6344, 2022 WL 2316201, at *5 (N.D. Ill. June 28, 2022)(66,000 jobs; June 1, 2018 hearing; R. 83); *Brian D. v. Kijakazi*, No. 19-CV-04149, 2022 WL 1720683, at *3 (N.D. Ill. May 27, 2022)(22,000 jobs; Apr. 5, 2018 hearing; R. 89); *Ronald P. v. Kijakazi*, No. 20 CV 339, 2022 WL 832674, at *4 (N.D. Ill. Mar. 21, 2022)(66,600 jobs; July 25, 2018 hearing; R. 52).

The vocational expert in this case also said the plaintiff could be a "document preparer." That job consists of preparing documents "for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices" and cutting "documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor

knife." D.O.T # 249.587-018. It seems as though there wouldn't be a lot of microfilming going on nowadays, but the vocational expert assured the ALJ that there were still 19,000 such positions in the country. It has to be said that that's a bit more believable than some of the numbers the vocational expert's colleagues have sworn to over the last little while which, yet again, have been incredibly inconsistent. *See Michael H. v. Kijakazi*, No. 22-CV-2446, 2023 WL 4473004, at *6 (N.D. Ill. July 11, 2023)(30,000 jobs; Nov. 22, 2021 hearing, R. 1498); *Tasha C. v. Kijakazi*, No. 22 C 816, 2023 WL 3688167, at *2 (N.D. Ill. May 26, 2023)(22,000 jobs; Sep. 9, 2021 hearing; R. 2018); *Andrea M. v. Kijakazi*, No. 3:22-CV-50105, 2023 WL 3479185, at *1 (N.D. Ill. May 16, 2023)(26,000 jobs; June 4, 2021; R. 68); *Jill A. W. v. Kijakazi*, No. 20 C 3854, 2023 WL 2954919, at *1 (N.D. Ill. Apr. 14, 2023)(62,000 jobs; Apr. 2, 2019 hearing; R. 121); *Bethany G. v. Kijakazi*, No. 20-CV-50483, 2023 WL 2683501, at *2 (N.D. Ill. Mar. 29, 2023)(15,000 jobs; Feb. 19, 2020 hearing; R. 69); *Joel K. R. v. Kijakazi*, No. 21 C 1905, 2023 WL 2646722, at *1 (N.D. Ill. Mar. 27, 2023)(19,000 jobs; Sep. 24, 2020 hearing; R. 55); *Josette S. v. Kijakazi*, No. 20-CV-4602, 2023 WL 2477536, at *4 (N.D. Ill. Mar. 13, 2023)(46,000 jobs; May 2, 2019 hearing; R. 66); *Tonya S. v. Kijakazi*, No. 20 CV 2294, 2023 WL 2349605, at *2 (N.D. Ill. Mar. 3, 2023)(70,000 jobs; Sep. 21, 2018 hearing; R.221); *Nicole R. v. Kijakazi*, No. 22 C 1891, 2023 WL 1970360, at *4 (N.D. Ill. Feb. 13, 2023)(30,000 jobs; July 26, 2021 hearing; R. 57); *Steven H. v. Kijakazi*, No. 21-CV-50257, 2023 WL 2374780, at *4 (N.D. Ill. Jan. 18, 2023)(90,000 jobs; Feb. 28, 2018 hearing; R. 551).

Even with a job that raises no doubts as to its existence, you don't want to look too closely at the estimates vocational experts have offered. The vocational expert in this case said there were 200,000 office cleaner jobs in the nation. That was as of June 28, 2022. Back at a May 2018 hearing, another vocational expert testified that there were only 27,000 such jobs in the country.

*Douglas G. v. Kijakazi*, No. 19 CV 7033, 2021 WL 3849637, at *4 (N.D. Ill. Aug. 27, 2021)(27,000

jobs; May 17, 2018 hearing; R. 66). Could office cleaner positions have increased more than seven-

fold during the pandemic-inspired move to remote work? It seems doubtful.[6]

  It's not that the number of jobs, even if one takes the lowest numbers ever estimated for the

three jobs in this case, isn't necessarily a significant number. So, this isn't a basis for remand. But,

from time to time, Magistrate Judges feel a need to point out these curious statistical discrepancies.

We don't do it to be difficult. It's just that, after all, no one likes to appear gullible or taken

advantage of. *See, e.g., Sara E. v. Kijakazi*, No. 20 C 03895, 2022 WL 4182404, at *7 (N.D. Ill.

Sept. 13, 2022)(Magistrate Judge Jantz – in a case involving table worker and address clerk statistics

– pointed out that "[i]t's no secret that the "Dictionary of Occupational Titles"—last updated thirty

years ago—is wildly outdated, . . . and the Administration's continued reliance on it would be a

running joke among courts and commentators if the stakes weren't so serious."); *Tasha C. v.*

---

[6] The vocational expert here also testified that there were 1,000 table worker jobs, 30,000 bench assembler jobs, and 12,000 mail clerk jobs. According to vocational experts, if you're either a table worker or a mail clerk, the last little while has been a roller coaster ride. *See, e.g., Leqia W. v. Kijakazi*, No. 20 CV 5687, 2023 WL 2572500, at *2 (N.D. Ill. Mar. 20, 2023)(6,000 table worker jobs (R. 71)); *Nicole R. v. Kijakazi*, No. 22 C 1891, 2023 WL 1970360, at *4 (N.D. Ill. Feb. 13, 2023)(19,000 table worker jobs); *Sara E. v. Kijakazi*, No. 20 C 03895, 2022 WL 4182404, at *7 (N.D. Ill. Sept. 13, 2022)(11,000 table worker jobs); *Victor M. v. Kijakazi*, No. 20-CV-7073, 2022 WL 2105893, at *2 (N.D. Ill. June 10, 2022)( 3,067 table worker jobs); *Norman B. v. Kijakazi*, No. 21 C 1042, 2022 WL 444198, at *4 (N.D. Ill. Feb. 14, 2022), 5,000 table worker jobs); *Dana C. v. Kijakazi*, No. 20-CV-3671, 2023 WL 2711598, at *5 (N.D. Ill. Mar. 30, 2023)(90,000 mail clerk jobs (R. 75)); *Laura B. v. Kijakazi*, No. 20-CV-03403, 2023 WL 2306938, at *4 (N.D. Ill. Mar. 1, 2023)(40,000 mail clerk jobs (R.72)); *Michelle F. v. Kijakazi*, No. 22 C 0183, 2022 WL 5183904, at *3 (N.D. Ill. Oct. 5, 2022)(13,000 mail clerk jobs); *Raven H. v. Kijakazi*, No. 20 C 6695, 2022 WL 1607556, at *5 (N.D. Ill. May 20, 2022) 47,000 mail clerk jobs); *Bruce L. v. Kijakazi*, No. 20 C 7684, 2022 WL 1453878, at *3 (N.D. Ill. May 9, 2022)( 32,000 mail clerk jobs); *Scott K. v. Kijakazi*, No. 18 C 1586, 2022 WL 60525, at *4 (N.D. Ill. Jan. 5, 2022)(32,800 mail clerk jobs); *Robert S. v. Kijakazi*, No. 20 C 6286, 2022 WL 45036, at *4 (N.D. Ill. Jan. 5, 2022)(60,000 mail clerk jobs). Meanwhile, again based on vocational expert testimony, the bench assembler game has been remarkably stable. *See, e.g., Edward G. v. Kijakazi*, No. 21-CV-1872, 2023 WL 4243213, at *4 (N.D. Ill. June 26, 2023) bench assembler (27,100 jobs); *Amanda L. S. v. Kijakazi*, No. 21 C 5775, 2023 WL 2711663, at *6 (N.D. Ill. Mar. 30, 2023)(27,100 jobs (R. 60)); *Wargula v. Saul*, No. 20 C 568, 2021 WL 1962414, at *3 (N.D. Ill. May 17, 2021)(27,600 (R. 94)); *Lisa S. v. Saul*, No. 19 C 862, 2020 WL 5297028, at *4 (N.D. Ill. Sept. 4, 2020)( 27,600 jobs).

*Kijakazi*, No. 22 C 816, 2023 WL 3688167, at *2 n.3 (N.D. Ill. May 26, 2023)(Magistrate Judge Harjani adding his skepticism to that of a number of other colleagues and expressing concern that jobs like "addresser" would seem to be "resoundingly obsolete" and "document preparer" would seem to be "antiquated."); *Thomas D. v. Kijakazi*, No. 20 C 2683, 2023 WL 2561614, at *8 (N.D. Ill. Mar. 17, 2023)(Magistrate Judge Fuentes waxing incredulous as well as offering his considered observations regarding the wildly fluctuating numbers of nut sorter jobs, as well as addresser jobs).

All judges understand that this is a massive bureaucratic system whose methods cannot be updated or overhauled overnight, over the course of months or, as it happens, over the course of years. As Seventh Circuit Court of Appeals Judge Scudder pointed out last year:

> Since 2008, the Social Security Administration has been promising courts and claimants alike that a new, unified jobs system—designed to simplify the process of compiling job-number estimates—will soon be available. More than a decade later, the Administration has not completed its work. So today's world is a distinct second best, with VEs made to cross-reference data points from multiple nonconversant data sets live on the witness stand at seemingly breakneck speed. There has to be a better way.

*Ruenger v. Kijakazi*, 23 F.4th 760, 765 (7th Cir. 2022)(Scudder, J., concurring). So, the sense is that the numbers for these jobs are just going to skew wildly all over the place for a good while longer.

Note that this little diatribe focuses on vocational experts. It doesn't mention the ALJs because, like Magistrate Judge Fuentes, we find it unfair to lay blame for this statistical process at their doorstep. *See Thomas D.*, 2023 WL 2561614, at *10 ("We also question how well-equipped ALJs may be to probe the reliability of a VE's job estimates based on the outdated DOT. . . .In this environment, like Lucy and Ethel in the chocolate factory, the ALJ perhaps was fighting a losing

game.").[7]  And the Commissioner's lawyers have nothing to do with any of this, of course.  Even they must do a face-palm or at least shake their heads occasionally when they get another case where the vocational expert says a plaintiff can address envelopes with an Underwood typewriter or sort filberts from hazelnuts.[8] And it's likely that they, like Magistrate Judges, recall that the number one vocational expert is swearing to now is nothing like the number another vocational expert swore to a couple of cases ago.  But, for starters, how about coaxing vocational experts away from employing jobs like "nut-sorter", "addresser", or "marker", as examples time and time again.  There must be jobs with similar demands that don't seem quite so glaringly archaic and with statistics that are quite a bit more consistent and, as a result, more believable, and thus persuasive and acceptable.

---

[7] After all, even if an ALJ has the time and the inclination to really delve into the vocational expert's methodology and try to figure out just how reliable the numbers are, they are often going up against a riddle, wrapped in a mystery, inside an enigma. Here's what Judge Scudder had to say about the task in his aforementioned concurrence in *Ruenger*:

> All three judges on this panel, assisted by very talented law clerks, read the transcript of the VE's testimony multiple times. The parties' counsel surely read it many more times still. And yet nobody can explain with coherence or confidence what the VE did to arrive at her job-numbers estimate. To my eye, the VE's testimony seemed rushed and rote, as if she expected certain questions and gave hurried and mechanical answers, without taking care—even in response to repeated objection—to explain what she did to arrive at the job-numbers estimate or why that method was reliable. We cannot make sense of the testimony—all of which came from a VE with substantial experience.

*Ruenger*, 23 F.4th at 765 (Scudder, J., concurring).

[8] Yes, the court knows those are two different names for the same nut.

**CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #19] is denied, and this case is remanded to the Commissioner.


**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 9/8/23

26